May I please the court? My name is Ryan Hicks. I represent the family of Peter Voces. Peter Voces was killed while working on an offshore platform owned by the Appalachia ERT. Mr. Voces was standing on a tank attached to that platform when that tank was mistakenly cut free due to a change in the work plan that governed the sequence of the decommissioning of that platform. That tank fell into the Gulf of Mexico where it dragged Mr. Voces with it to the seafloor where Mr. Voces drowned. Mr. Voces' family has raised two claims both arising under Louisiana law that are at issue in this appeal today. One is a claim for independent negligence in Louisiana alleging that ERT assumed a duty to ensure the safety of the work plan governing the decommissioning and its safe communication to contractors, specifically OSF of which Mr. Voces was an employee. The other claim is a claim for vicarious liability alleging that ERT is responsible for the negligence of its contractor OSF. The court below granted summary judgment on both claims and I'd like to focus my argument this morning on the claim for independent negligence. And in order to do that, it's important to understand the mistaken premise which is the root of the error of the district court and that is the district court's treatment of finding that there is no practical difference between a claim for independent negligence and one for vicarious liability. What the court below did was look first and only to vicarious liability, determine that there was no operational control to get around the independent contractor defense, and on that basis went on to determine there was therefore no independent negligence. That's not the law in the state of Louisiana. In Crane and other cases we've cited, an individual corporation in Louisiana can be independently negligent even in the absence of vicarious liability, can be vicarious liable in the absence of independent negligence. It's not a one or all proposition. These are claims with distinct elements. As such, they require the court to look to different evidence. And when the court below simply looked to vicarious liability, it failed to consider evidence of independent negligence, specifically evidence that ERT had assumed a duty under Louisiana law and was negligent in performing that duty. How'd they do that? I mean, are you talking about what the company man did? No. Well, Your Honor, the duty that they assumed was to ensure the safety of the work plan and its proper communication. That could be done at a number of levels. Number one would be through the company man. There are also engineering reviews that are done at ERT. But in order, the question is, the law in Louisiana is settled that a party who otherwise has no duty to perform a particular task, once they assume that task, they take on a duty to perform that task in a safe, reasonable, and prudent manner. And failure to do so gives cause to an action for negligence. We cited this in Crane and a number of Louisiana cases. The question before the court is whether ERT assumed a duty. And not a dispositive issue. Simply, is there some evidence in the light considered most favorable to the Vosa's family that ERT assumed this duty of ensuring the When the facts are disputed about whether that duty was assumed, it becomes a fact issue. And summary judgment is improper. And we cited a number of cases. So what the court should have looked to, first off, was this question of duty. And that's what I would like to focus on initially. Obviously, there needs to be a duty for this independent negligence under Louisiana law. And our argument and claim is ERT assumed the duty. The most compelling piece of evidence that ERT assumed this particular duty is ERT's own words. And what ERT said in a letter to the Department of Interior and Vesey was, it was our responsibility to ensure the safety of the work plan and its proper communication to the workers. This is not the only evidence of the assumption of duty, but I certainly believe it's the most compelling. And it's important to note that in the court below, there was no objection to this letter. There's been no rule of evidence cited as to why the court should not have considered this letter. It's admissible evidence. And what the letter is, is a letter from ERT to Vesey. After this accident, Vesey convened a panel investigation. That panel investigation took about a year. And after a year, Vesey, the panel, released its findings. And included in those findings were a recommendation that two incidences of noncompliance be issued to ERT. ERT wrote this letter. It's tab 9 in our excerpts, 1702 in the record. And it's about a four or five page letter. And ERT says a number of things. And I would also note that in the court below, ERT cited this letter at 2344 in the record, footnote 15, as demonstrating the reality of what happened on the platform. And among all the different facts about who's the PIC and who has custody or any other issue, what ERT says to Vesey is, it was our responsibility to ensure the safety of this work plan and to ensure its proper communication to the workers. As a general principle, that is evidence, which when considered. You're talking there about the work plan as it was confected to start with, right? I'm talking about the work plan as modified. And that's an important point. This work plan went through a couple of iterations. At one point it was in the company phase where there were some engineering reviews. And ERT looks at this work plan. And there was some disputed evidence in there about whether there was any consideration given to the fact that these cranes had been added to the top of the tank, which gave it an outward, outboard turn of momentum. But while they were on this platform, the plan changed. And due to high seas, the plan was, remove these two cranes from the top of this platform. And these are large cranes. These are 110 feet, 25 tons each. They were added to the tank at a later date. The evidence is disputed as to whether ERT or OSF was ever given a schematic showing they existed. But the number one step was, remove these cranes. Due to high seas, they changed the plan. And they said, we're not going to remove them. OSF, the barge superintendent, found that the high seas would make the crane lift impossible, or that they couldn't perform it. He went to the ERT PIC, Ken Goyens, and said, the plan needs to change. Now, what his testimony was, was he went to Peter Goyens with the changes to make sure that Peter Goyens, the ERT PIC, agreed. Agreed that this was the right way to do it. Well, and I take it that Goyens, his concern was, are we going to have to pay more? I think that's one of his concerns. He testified that he was there to make sure work was going on in accordance with the contract. Yeah. But he was informed, and I think what's important is that Joe Douglas, the barge superintendent, stated that he went to Mr. Goyens to get his agreement that this was the right way to go to change the sequence. So when the cranes no longer come off, the decision is made then to begin cutting the welds. Do Goyens have the contractual ability to say, no, you can't do that? I don't know that he had the contractual... Well, that's important. The contract is what governs who had the authority to do what here. Well, Mr. Goyens testified that he had stop work authority, and while I can't point you to the direct provision in the contract, I do believe that the contract contained stop work authority for Mr. Goyens to put a stop to anything on the contract. So your position is that because he had stop work authority, that therefore, he's responsible for what happened here? No, Your Honor, our... As his lawyer is, I'm sorry. Our position is that the evidence shows that he has a duty to ensure the safety of the work plan, as shown by their own admission to Bessie. And so the preliminary question is, does E.R.T. have a duty to ensure... Would that be an amendment to the contract? Because the contract did not provide for that. Are you saying that the contract said one thing, but the action he took was contrary to what the contract... Correct, Your Honor. What we're saying is that he assumed a duty, an extra contractual duty. While he may have had a contractual ability to be able to stop work, and while these contracts, usually the master service agreements, are relatively boilerplate. I was going to say, I mean, the reason why this case is being argued is because these things are boilerplate, and there are understandings at industry. I'm not in it, but I, over the years, have seen that in this courtroom. So... I guess I would point the cited, where the court looks, on the one hand, of what does the contract say about who's responsible for safety, but then looks at the other issue of, was there an assumption of independent negligence? And I think what is interesting in, we cited Dupre, the Moore case, the Teeter case, is that if there is some evidence, some evidence, that they assumed this particular duty for the safety of the patient. If I understand what the state of the record, so far, anyway, is that some work was done by severing these, what do they call them, connections with the rig, I guess, by, not by ENT, but, I'm sorry, I'm confusing who's, by who was supposed to do it. That all happened, and I take it that the company man on the rig was not aware of that. The company man stated he was unaware of the progress of the welds at the shift change. But I think the question of whether or not ERT, number one, assumed the duty of ensuring the safety of the plan, looks primarily, must look to this evidence. What evidence is there that they assumed safety for the plan? What ERT has argued has sort of gone on a couple of ways. Number one, they say, we only acquired this duty or took on this duty to comply with a federal regulation. They haven't cited a regulation that requires them to ensure the safety of a contractor work plan, and there's no testimony that's the reason they did it. They've also argued, in a roundabout way, that what our letter to Bessie said was that we didn't violate 30 CFR 250.107, which requires that operations be performed in a safe and workmanlike manner. And their basic argument there is, look, just this duty violated a regulation for which there's no freestanding cause of action. Therefore, the negligence can't exist. But do we have any evidence that shows that Goyans was giving specific instructions on how to go about deconstructing this oil rig? No, Your Honor, we don't. But that gets into the vicarious liability claim. And that is a different standard. That's operational control or authorization, express or implied. For independent negligence, the question is simply, is there some evidence that ERT assumed the safety of the work plan? In their letter to Bessie, they admit that that was their job. We deposed Stephen Franz, who was their corporate representative, asked him, how do you discharge your duty of ensuring that the work plan is safely communicated? He discussed that. One of the ways you do it is you hire the absolute best contractor you can get, okay? So what you're saying is, never mind, this was supposed to be the premier, whatever, deinstalling of a rig company, because you're liable anyway. But I don't think that's what we're saying, Your Honor. What we're saying is why isn't it? I mean, isn't that the impact of what unless you got two ways to make a case here. Right. You got one way says, oh, well, he was out there, the company man was out there day and night, and he was telling them what to do, so he assumed the responsibility. You're not making that argument, I don't think. No. And the other way is to say, well, somehow or other, as a matter of law, what happened here makes ERT liable. That's right. But I think the question is, if they say we have this turnkey contract and we rely on experts. That's what they do. That is what they say. Not only what they say, it's what they do in that industry, judging by what I've seen here over the last 30 years. It is. But what Crane and that line of cases stands for is that even when they rely on somebody to do that, once they take on a particular duty, even if it should be within the province of the contractor. Okay. What duty did he take on? Specifically, what's the deal? The specific duty is the duty that ERT admitted it took on to Bessie, which was to ensure the safety of the work plan and its proper communication. Once there's some evidence that they assumed that duty, and it's contained in the document, was it in fact a safe plan? And was it in fact properly communicated, Your Honor? And I think that gets a little bit into then this question of the relying on the performance of OSF. But the preliminary question is ensuring this plan is safe. And as we have discussed in the Was Goins, did Goins authorize that the 50 percent rule not be followed? Or was that Douglas' decision? And was Goins informed that the 50 percent rule was not going to be followed? Goins was not informed that it would not be followed. But the record shows that the 50 percent cut rule was not understood by many people on the platform. We cited in the Bessie report and other parts of the record that various workers didn't know what 50 percent meant. There was dispute across the various companies about what 50 percent meant. There was deposition testimony from Mr. Douglas that this was a rule of thumb, wasn't exactly sure which two would be cut in this situation. It's far from an industry standard, which is why we say at that point we have an unsafe work plan. And there's evidence that ERT did not discharge its assumed duty to ensure that that plan was safe. Wasn't it represented to Mr. Goins that the 50 percent rule would be followed? I believe Mr. Goins testified that it was. So it was the worker bees on the platform who varied from it. Well, the 50 percent rule, which is defined in the record as being no more than 50 percent, and no one knows whether this is the outboard wells or the inboard wells or 50 percent of each square or whatever it is, they obviously, yes, they did, Your Honor, cut more than 50 percent. And whose employees were they that did that? Those were the OSF employees. My time is up. Thank you, Your Honor. Mr. Juergens. Good morning, Your Honors. Jack Juergens for the appellees ERT and TALOS. This is a relatively simple and tragic case in which, once again, a tort plaintiff in an OCS offshore Louisiana event seeks to create liability in an oil company for the negligent actions of an independent contractor. That's what this is. You can package it seven, ten different ways. Assume duty, whatever. That's the bottom line. And what is this Court told, instructed, as to the law on this point? Well, Dupree v. Chevron, 109F3-230, we are persuaded that our decisions in Olson, Borg, Romero, et cetera, control this case. We agree with the district court that the regulations adopted pursuant to the Outer Continental Shelf Lands Act provide no basis for an implied cause of action against Chevron, nor do those regulations create an independent duty under Louisiana law on the part of Chevron, the platform owner in principle, to protect a contractor's employees from hazards created by the contractor. Is that not what was done here? Exactly. Now, there was discussion. We hired OSF because they are one of the premier companies in platform removal. We paid them, my clients, not we, I didn't pay, my clients paid $4 million on a turnkey basis, gave them all of the plans, all drawings, everything they needed. That's uncontroverted in the record. Well, what they gave them were the plans that showed how everything was set up at the moment. Yes, ma'am. They didn't give them the work plans for how to do the job. I apologize. You need to be clear about that. Yes. Thank you, Your Honor. No, we did not give them the work plans. We gave them the background material from which they developed their work plans. I'm glad that you mentioned that. The work plan. The work plan is in the record. The first page of the work plan is the record, page 1372. And this is the five-page document prepared by OSF. And what does the lead-in paragraph say? What does it say about responsibility? It says, this is a preliminary plan subject to change for offshore environment. The barge superintendent, OSF's Mr. Douglas, will determine the final procedure based on actual site requirements. The company rep, Mr. Goins, will be informed of any changes. What was Mr. Goins told? And, Your Honors, he was told that OSF was going to follow its 50% rule. They didn't. And what's truly tragic about this, there were, I believe it was either 16 or 20 pad wells that held this tank in place. The day crew started cutting them. Then when the night crew comes on, they continue to cut them. And they get to where they've cut all of them. And the only thing holding that tank in place is a catwalk that connects the ABJ332 tank to an inboard tank, the 334 tank. That's all that's holding in place, that catwalk. All the other pads have been cut. Mr. Vokes, not knowing they've all been cut, gets on there. He cuts the wells on that last catwalk. And that's when the accident happened. There was nothing holding the tank in place. What was Mr. Goins told? All he was told was we're going to follow the 50% rule. There was no change in the order of the activities. The initial plan was to take the attachments off of the tank first, the two arms that extended up. Because of the bad seas, they couldn't do it. Barge Captain Duggan said, okay, we will go ahead with prep work and start cutting pads on the tank to prepare for removal. Their plan was to remove those arms first. Their plan wasn't changed. The only thing that happened that was not planned was the failure of OSF to follow their 50% rule because of miscommunications within their own organization. How do you respond to the argument that the letter that was written by Mr. Jones to Bessie seems to imply that ERT assumed a duty to protect the safety of the workers? It seems that that letter seems to represent that. I was about to comment on that, Your Honor. That letter, basically through that letter, the appellants are arguing that ERT is obligated to ensure, you've heard him say ensure many times, ensure OSF's safe job performance. ERT was issued an incident of noncompliance by Bessie for failure to perform operations in a safe and workmanlike fashion. That's the same regulation that this Court said in Dupree does not create a cause of action or a duty in an oil company. That's a regulation that determines the company's relationship to the federal government, not tort liability, which is determined by reference to Louisiana law and its independent contractor defense. So Mr. Jones writes this letter in response to the regulatory violation, the claimed regulatory violation. It's irrelevant to the duty owed under Louisiana law. And also, if you read the entire letter and you see what he's saying, and this is, if you would, and I hope would ask that you take a look at this page, it's 1704 and 1705 of the record is where that language is. As the expert, this is from that same letter, as the expert contractor overseeing platform decommissioning, OSF was responsible for several levels of oversight to see to it that its plans and rules are followed by its employees. That's what's in that letter. OSF is one of the most experienced and widely used companies specializing in platform decommissioning work. An operator like ERT does not perform decommissioning activities, and that is why we hire specialized expert contractors to do the work. And he may conclude with a statement that if an ink is appropriate in this instance, then operators like ERT would be required to supervise every employee of every independent contractor. That's exactly right. To ensure that the employee did his work correctly and safely. That is not the law. It would change. Completely. What has gone on for decades out on the Outer Continental Shelf. It is yet another wish to make the oil company. I don't blame him for wanting to do that. But, Judge, you hire somebody to come do work at your house, you hire a competent contractor, you hire the best contractor in the business, and he's on the roof doing some work, and he doesn't follow a rule, and he falls. And you should be liable? I understand what your argument is, and I understand his. It just seems to me that if we buy his, we change the basic rules of engagement on what goes on on the Outer Continental Shelf. Let me say, I'm not arguing for or against that, but I think that, and your answer is you're right, Judge, you don't want to do that, right? My answer is you're right, Judge, and I would reference the Coulter, Dupree, Graham, Bootwell, Grammer, Ainsworth, Broussard, of which Judge Prado was on the panel. Judge King was on the panel, and Robertson v. Arco. And then you get into the other case. The case is talking about, in which it's been argued that because of the Federal regulations that the oil company is the insurer of the safe job performance and is the independent contractor. And I mentioned the Dupree case, but there's others also, going back to Olson v. Schell, 561 F. 2nd, 1178, the Borg case. And just let me read this one quote from the Borg case, Borg v. Texaco. It is the plaintiff's position that because of these regulations, a platform owner who is otherwise free of negligence and who hires an experienced independent contractor and assigns to that contractor some work should be legally responsible for the negligent work methods utilized by that contractor. We feel that it would be error to so interpret these regulations absent a clear indication from Congress that this was their intent. Our reading of the legislative history of the Outer County Ownership Lands Act uncovers no such intent. This is our case. Also later in Fruget, the same 337 F. 3rd, 558, the same conclusion. And in Fruget, the court states, the regulations govern the parties' joint and several liabilities vis-à-vis the government, not amongst themselves. Amongst themselves, ERT's duties are decided by reference to Louisiana law. And what is the mention about the independent negligence of an independent duty of ERT? Well, what is that law? The duty extends to maintaining premises in a reasonably safe condition and warning invitees of any concealed or hidden defects on the premises not created by the independent contractor. A platform owner, and this is from Bootwell, 864 F. 2nd, 408, also Ainsworth. It is settled law that a platform owner's duty does not encompass protecting an independent contractor's employees from hazards created by the contractor. Even where a principal has knowledge of the danger created by its independent contractor to which the contractor's workers are exposed, it has no affirmative duty to intervene and is not liable for failing to do so. Well, here, Mr. Goins didn't know they weren't going to follow their 50 percent rule. And then finally, the duty of a platform owner to ensure safety of the premises  The uncontested facts demonstrate that's not the case. The uncontested facts demonstrate that OSF remained responsible for its safe job performance. It's uncontroverted in the record. You show me, there's nothing in the record that OSF was looking to ERT to tell it how to do its work. Why would we pay, why would my client pay $4 million to OSF if it was going to have to tell them how to do the work? So, Judge King, you're absolutely correct. The cases are legion, and the cases are correct because when you hire a contractor, you make sure that he has the expertise, and he does have the expertise. And his guys make a tragic mistake. The principal should not be liable for that mistake by the independent contractor. And that's established in the case law going back 20 years. Are you saying that a contract's a contract and that's the way it's going to be? I mean, I guess what I'm asking is the facts of this case do not show that Mr. Goins took an active part. Do you concede that in maybe some other situation where there is evidence that the company's supervisor boss or whoever took an active role in deciding how things are done that possibly we could go beyond the contract and say, well, while the contract said something, the evidence shows that the company actually took an active role? Your Honor, I agree completely. If there were evidence, any evidence that Mr. Goins said, no, you go ahead, you cut all of those wells right now. If he ordered him to do that, I had ordered the unsafe practices under the independent contractor defense. I exercised operational control. That did not happen here. To the contrary, Mr. Goins was told they were going to follow the 50% rule and said fine. Barge Captain Douglas didn't know they weren't going to follow it. He was quite upset and surprised that they didn't. Mr. Goins had no knowledge of that. If Mr. Goins had known of that, if he had instructed that, said no. We weren't in a rush. We were paying them $4 million on a turnkey operation. Take your time. It was up to them. And that's the case. So there were some communication issues within that crew. One night crew did not realize the day crew had already cut pad wells. Night crew continued to cut them, cut all of them. Tank stays in place until Mr. Voxus gets on that catwalk and cuts those last two little wells. And then it rolls over. So Judge King, the result of the trial court below was in keeping with the decades of jurisprudence of this court on the independent contractor situation. Thank you. Thank you. You've got a hard case here. No wonder they got such a good lawyer, huh? Your Honor, I think there's hard law in this case. There's no doubt about that. I think the facts and the evidence are relatively simple. The question for the court on summary judgment is, does the evidence exist? And in the light considered most favorable to the Voxus, does it raise some issue of fact of whether or not ERT performed a specific duty? Well, the evidence you have primarily cited on that is the letter. Let's put the letter aside for maybe some good legal reasons why it doesn't have much impact. What else is there besides the letter? Besides the letter, Your Honor, there's the testimony of the ERT corporate representative, Mr. Franz, who discussed what ERT's duties are when discharging its responsibility to ensure the safety of the work plan and its communication to the workers. There is the declaration of Joel Benko, who discusses the fact that Mr. Goyen's had ultimate authority over the steps taken on the platform. There's the testimony of Joe Douglas, who was the barge superintendent who stated that he needed the agreement. I think these pieces, taken in context as well with the letter, prove a very important point, that there is some evidence of ERT's responsibility for the safety of the work plan. And Mr. Juergens discussed at length the Dupre case and a number of cases. A number of the cases he discussed, such as Frugge and Borg, are vicarious liability cases. And they look to this simple fact pattern we see a lot. You have a company man. You have a safety manual. Does that get you past vicarious liability?  But in cases like Dupre, and in Crane, the court looked and said, not for purposes of vicarious liability, but for independent duty, what do you have? And in the Dupre, I think it's very instructive in this case. The court looked at two bases, possible bases, for independent negligence. One was the claim that Chevron took over safety for the whole rig. And it was the basic fact pattern that we see. Company man, work manual, occasional walk-through. And the court said, no. That doesn't get you that duty. And we realize this is kind of an end-around on the vicarious liability jurisprudence. That doesn't get you operational control. We're not going to say it gets you an independent duty. But then the court looked and said, did you acquire a very discreet and limited duty when you approved the placement of this rig and motor on the platform? Because that's what caused the accident, the placement of this rig with a motor extending over the gulf, and the man fell into the gulf. And what the court looked to then in Dupre was, is there any evidence that your approval of the plan, that your discussion of this plan, encompassed the safety of the plan to some degree? There's just no evidence that there was any of this in Dupre. But what we have here is this admission. Now, why they took on that duty, I don't know. They didn't have to take on that duty. But the point is they did. And when they assumed that duty, they become liable. And ERT's argument that we only took on this duty to comply with 250.107, it doesn't pass muster. 250.107 doesn't say what you have to do to perform safely on the gulf. There's no checklist. What 250.107 says is whatever it is you decide to do out there, whatever task you've been given, whatever task you give yourself, perform it in a safe and workmanlike manner. What this letter says is not, you know, we complied with, you know, we took on this duty to comply with 250.107. What this letter says is we complied with 250.107 by performing our duty safely and in a workmanlike manner. And whether this is an operator saying, you know, I don't have charge over the whole platform, but I'm going to make sure it's our job to make sure your scaffolding is safe or your food services or your aviation or your basket transfers. Once they get there, they have that discrete duty separate and apart from the whole platform. And we're not arguing that the duty in this case was for the entire platform. We're arguing in line with Crane and even with Dupre that this is a discrete duty. So are you arguing this is true as a matter of federal law? Is that what you're arguing? Are you saying never mind about the Louisiana law? We're saying as a matter of federal law they had this responsibility? No, we're saying Louisiana law is that they can assume this duty. What they've said is that because their negligent act happened to also violate a federal regulation for which there's no freestanding per se cause of action, the negligence can't survive. That's an unworkable construct. Every time someone's injured or killed on the shelf due to negligence, by definition it violates 250.107. Something wasn't done safely. The regulatory violation is incidental to the act of negligence. We're not arguing some end around and trying to make a per se cause of action. We're not arguing that it was not safe and workmanlike. And I realize I'm finished. We're arguing it was not done reasonably and prudently, which is the same. Thank you. Thank you, Your Honor.